UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

ANTHONY FELICE,                          )
                                         )
                Plaintiff,               )
                                         )
        v.                               )        No. 4:09-CV-071-JD
                                         )
REPUBLIC AIRLINES, INC.,                 )
                                         )
                Defendant.               )

**MEMORANDUM OPINION AND ORDER**

Now before the Court is Defendant Republic Airlines, Inc.'s ("Republic") motion for
summary judgment [DE 56-58] seeking to have judgment entered in its favor on Plaintiff
Anthony Felice's complaint alleging Republic committed sex and race discrimination in
violation of Title VII by forcing his resignation[1] [DE 1]. Plaintiff Anthony Felice ("Felice"), by
counsel, responded [DE 61] and Defendant replied [DE 62]. For the following reasons,
Defendant's motion for summary judgment is DENIED.

**I. Factual Background**

*Republic's Policies and Union Agreement*

The current claim stems from Republic's termination of Felice as an airline pilot because
he allegedly failed to follow company policies and procedures during and after Flight 3421 [DE
1 at 2; DE 57 at 9]. The policy provisions at issue here, taken from Republic's Flight Operations
Manual (FOM), are the following:

---

[1]Plaintiff elected not to pursue his Indiana common law claim of wrongful discharge [DE 61 at 1,
n. 2]. For this reason, Plaintiff's wrongful discharge claim is ordered voluntarily dismissed.

**Part 6.2.1: Amended Release**

> An amended release [from dispatch] is required when . . . [a] [c]hange of flight plan that alters the route more than 50 miles from that originally filed or changes the filed altitude by 4,000 feet or more.

[DE 58-8 at 2].

    **Part 20.6.2** titled **"Notification"** requires pilots to notify a dispatcher via telephone to report, as soon as practicable and prior to flying another flight, any "emergency" or "diversion."

[DE 58-8 at 3].

**Part 20.7.5: MANDATORY REPORTING EVENTS**

> An Irregularity Report is required for the following conditions – …
> 4)  EMERGENCY is declared . . .
> 19)  Flight DIVERSION or RETURN TO FIELD, or landing on WRONG RUNWAY . . .
> 23)  Aircraft lands with reserve FUEL or less . . .

[DE 58-8 at 4].

**Part 20.13.3: DECLARING "EMERGENCY FUEL"**

> If projected fuel consumption will result in landing with less than 30 minutes of fuel remaining, declare an emergency. Notify ATC [or Air Traffic Control] and declare low fuel and estimate minutes of fuel remaining.  Notify dispatch as soon as possible.

[DE 61-40 at 4].

    Felice indicates that there is a difference between declaring a "fuel emergency" versus declaring an "emergency." Declaring an actual "emergency" triggers a lot of alarms and causes many questions to be asked, such as how many "souls" are on board [DE 61-27 at 1].  The FOM seemingly draws this distinction as well.  Similar to **Part 20.7.5**, FOM **Part 20.7.2** discusses the need to have a written Irregularity Report for the "[u]se of emergency authority" [DE 58-5 at 5] and FOM **Part 21.1.4** indicates that when either a caption or dispatch "exercise their emergency authority" an Irregularity Report is required to be filed within 48 hours [DE 58-8 at 5].  In other

words, these FOM parts do not specifically indicate that an Irregularity Report is required when a pilot declares "emergency fuel"— a distinct term that is used in **Part 20.13.3**.

Also relevant to these proceedings is the collective bargaining agreement entered into by Chautaqua Airlines, Inc. and Teamsters Airline Division Local 747, which addresses disciplinary procedures for pilots.[2]  The relevant portions of Article 18 read as follows:

**A. Settlement of Disputes**
> A pilot, or the Union on behalf of pilots, covered by this Agreement who have a grievance concerning any action of the Company affecting them, or who believe they have been unjustly disciplined or discharged, which dispute has not been settled or resolved in conference with Company officials, shall use the dispute resolution procedures as established herein.

**B. Investigative Hearing – Discipline and Discharge**
> 1. *A pilot shall not be disciplined or discharged without just cause and without previously being afforded a hearing before the Chief Pilot or his designee,* provided that the pilot has made himself available for the hearing.
>> a. The pilot shall be notified of the time and place of the hearing and the nature of the matter discussed.  The notice must specifically reference that discipline may be assessed and that the pilot is entitled a Union Representative at the hearing as provided in paragraph b. below.  Concurrently, the Union shall be notified.
>> b. The pilot shall have the right to be accompanied to the hearing by an authorized employee of the Union, or the pilot employee of his choice, provided such choice is reasonably available.  In no case will the hearing be held without Union representation if such representation is requested and is available within a reasonable period of time.
>
> 2. *When a crewmember is disciplined or discharged, the Company shall furnish him with a written statement of the precise charge(s) against him* . . .

**C. The Grievance Process**
> 1. Discipline and Discharge

---

[2]Republic Airlines is a subsidiary of Republic Airways Holdings [DE 58-1 at 7].  Republic Airways Holdings is a holding company that owns several other airlines, including Chautauqua Airlines, Shuttle America, Inc., and Frontier Airlines [DE 58-1 at 8; DE 58-2 ¶ 2]. Felice actually began his employment with Chautauqua Airlines and was eventually transferred to Republic Airlines [DE 58-4 at 37, ¶ 2-11].  It is undisputed that Felice, as a pilot of Republic Airlines, was represented by Local 747 of the Teamsters Union Airline Division and worked pursuant to the collective bargaining agreement [DE 61-35 ¶ 3].

a. A grievance challenging an action of discipline or discharge shall be in writing, signed by the affected pilot or the Union representative, and must be submitted to the Director […].

[DE 58-6 at 3] (emphasis added).

In addition, the Associate Handbook for Republic contains the following statements:

Associates who violate company rules and polices will normally be given an opportunity to improve. *Disciplinary actions are usually corrective and progressive in nature.* However, *serious* misconduct and work performance problems or violations of laws and certain policies may warrant immediate disciplinary action, which may be accelerated to any level at any time, that may include suspension or termination of employment.

[DE 58-7 at 3] (emphasis added).

The Associate Handbook restates the possibility of termination resulting from severe misconduct:

[I]n the case of flagrant, serious or continuous violations, at the discretion of the Company, disciplinary action may begin in any of the steps listed below or may immediately lead up to and including termination of employment[.]

[DE 58-7 at 7] (emphasis in original).

Among the forms of misconduct the Associate Handbook specifically identifies is "Abuse or Violations of any or all Company policies and operational procedures." [DE 58-7 at 6].

### Events Leading up to Felice's Termination

The material facts construed in Felice's favor show that Felice, a Caucasian male, began his employment with Chautauqua Airlines in 1995 and was eventually transferred to Republic [DE 1 ¶ 9-10; DE 58-4 at 37]. Felice was a pilot for Republic at all times relevant to this action [DE 58-3 ¶ 2] and was represented by Local 747 of the Teamsters Union Airline Division ("union") pursuant to the collective bargaining agreement [DE 61-35 ¶ 3]. Jeffrey Davis ("Davis"), a Caucasian male, is the Director of Flight Operations for Republic and at the times

relevant to this action served as Felice's supervisor [DE 1 at ¶ 9; DE 58-3 at ¶ 3; DE 61-16]. On January 23, 2008, Davis notified all personnel of the importance of efficient fuel consumption and noted that if a pilot believes he will land with less than 3,000 pounds of fuel then "min fuel" should be declared, or believes he will land with less than 2,000 pounds of fuel then "fuel emergency" should be declared [DE 61-35 ¶ 12; DE 61-37 at 3].

On February 16, 2008, Felice piloted Republic's Flight 3421, scheduled to fly from Reagan National Airport in Washington D.C. ("DCA") to Dallas/Fort Worth International Airport in Texas ("DFW") [DE 58-3 ¶ 4]. During the flight on February 16, Felice admittedly strayed from the recommended altitude of 34,000 feet, and instead flew at an altitude of 32,000 feet because of turbulence that was reported at the higher altitude–consequently increasing the amount of fuel burned [DE 61-20 at 1; DE 61-36, ¶ 15]. However, during this time Felice never went more than 4,000 feet off course, which would have required an amended flight plan [DE 61-20 at 1].

A conversation between Felice and dispatch took place via a multifunctional unit capable of navigation and messaging referred to as FMS [DE 58-4 at 14; DE 58-5 at 2]. Felice received information indicating he could expect to hold over at Dallas, but Felice had no holding gas remaining in the aircraft, so he communicated to dispatch that he had no holding fuel and therefore he was headed to Austin, Texas ("AUS"), his "filed alternate," with 5,700 pounds of fuel on board[3] [DE 58-4 at 5-11; DE 58-5 at 2; DE 61-36 ¶ 16]. Felice was originally scheduled to land in DFW with 5,849 pounds of fuel, and Felice believed he would end up landing in AUS with 3,100 pounds of fuel [DE 61-22; DE 61-36 ¶ 16]. After Felice notified dispatch of his reroute to AUS and estimated fuel level, it was the responsibility of dispatch to verify the plane's

_____

[3]To the extent Republic argues Felice did not properly notify dispatch prior to his diversion to AUS [DE 62 at 2], such an inference would impermissibly favor Republic at the summary judgment stage. *See infra* at p. 9-12.

actual fuel burn [DE 61-26 at 1]. Yet when dispatch was notified that Felice had no fuel to hold, it requested that Felice change his destination from AUS to Wichita Falls Municipal Airport ("SPS") so he would have holding fuel [DE 58-4 at 12; DE 58-5 at 2]; the latter being approximately 250 miles closer to Flight 3421's current location than the former [DE 58-3 ¶ 8]. Felice did not specifically know what the weather was like at SPS and instead of providing the information, dispatch advised that the airport in Oklahoma City ("OKC") was a second alternative for landing [DE 58-5 at 2; DE 61-22; DE 61-23; DE 61-24; DE 61-35 ¶¶ 13-14]. Dispatch also notified Felice that the weather in AUS was "not good" [DE 58-4 at 13, 16-17; DE 58-5 at 2], but Felice disagreed because the weather looked good from where he was positioned [DE 58-4 at 17; DE 58-5 at 2; DE 61-6 at 1] and ATC had verified that planes were landing without any problems in AUS [DE 61-6 at 1]. Moreover, Felice was aware that the weather in OKC was bad, having passed through the area earlier in the flight [DE 61-35, ¶ 14].

Neither Felice, nor his co-pilot Timothy Lane, recognized SPS as an airport designation, and neither had ever flown there [DE 61-35 ¶ 13]. Felice could have located either SPS or OKC in seconds by inputting the respective three-letter identification code into the FMS system, but he did not do so [DE 58-4 at 14-15]. Republic argues that this signifies Felice's failure to give "meaningful consideration" to diverting to SPS [DE 62 at 3], while Felice argues that dispatch never gave him sufficient time or information concerning SPS and he was unfamiliar with the airport [DE 61-22; DE 61-23; DE 61-24; DE 61-35 ¶¶ 13-14]. Moreover, as the pilot in command, Felice had the final authority to decide whether to change alternate destinations and he declined to do so [DE 58-5 at 2; DE 61-26]. Flight 3421 did not require an amended release since Felice flew to his "filed alternate" (AUS), rather than changing it to either SPS or OKC [DE 58-4 at 60].

On the way to AUS, Felice had to avoid some inclement weather and burned more fuel [DE 61-24]. Upon arriving at AUS, another plane had deviated to AUS and was expected to land in front of Felice. *Id.* But Felice believed he would then have less than 2,000 pounds of fuel on landing, so in order to land first, Felice declared a "fuel emergency" to ATC in accordance with Republic's policy [DE 58-4 at 22-24; DE 61-24; DE 61-36 ¶¶ 17, 18]. Approximately 19 minutes after Felice declared a "fuel emergency," Flight 3421 landed safely in AUS without the need to have the airport rescue and firefighting unit stand by [DE 61-42 at 3]. In fact, Felice arrived at the gate in AUS with 2,400 pounds of fuel, or 25% above the amount which would constitute a fuel emergency and which the Federal Aviation Administration considers "reserve fuel" [DE 61-36 ¶ 19].

Upon Felice's return to Dallas, he spoke via telephone with his superior, Jeffrey Davis, but failed to mention the earlier occurrence after Davis and Felice got into a disagreement about how much rest the crew needed before its next flight [DE 58-4 at 33-35]. On February 19, 2008, 3 days after the incident, Felice reported the "fuel emergency" by filing an Irregularity Report [DE 58-4 at 68; DE 58-9]. Felice never notified dispatch of his "emergency." [DE 58-3 at 3]. An investigation ensued, during which Felice was interviewed about the incident by Davis [DE 58-1 at 13]. Davis concluded in his affidavit that "Felice failed to *report an emergency when he called dispatch* upon his arrival in AUS . . . [and] he *failed to report the emergency he declared on Flight 3421 within 48 hours*, as required by Company Policy." [DE 58-3 at 3] (emphasis added). Davis also maintained that "Felice *did not notify dispatch of his decision to divert* to AUS," when in reality, Felice did tell dispatch he had no holding fuel and was heading to AUS [DE 58-3 at 3; DE 58-4 at 5-11; DE 58-5 at 2]. Importantly, Davis did not charge Felice with having failed to properly file an Irregularity Report relative to Felice's decision to divert to AUS

[DE 58-3; DE 61 at 17]. Nor did Republic provide Felice a written statement of the precise charges against him [DE 62-1 at 4-5].

Felice was asked to resign or be terminated due to his alleged failure to comply with company policy and procedure [DE 58-3 at 3]. On March 6, 2008, Felice tendered his forced resignation.[4] *Id.* Felice contends he was not given a hearing, although Davis contends Felice was given a hearing [DE 61-36 ¶ 21; DE 62-1 at 4]. Felice declined to file a grievance concerning his termination because he anticipated he would lose [DE 61-36 ¶ 21].

Relative to similarly situated employees (or "comparators"), Felice is not sure whether someone replaced him, but assuming someone did, he does not know the individual's race or sex [DE 61-26 at 1]. However, he identifies the following individuals as comparators [DE 58-4 at 47-53; DE 61-17; DE 61-18; DE 61-19; DE 61-35 at 2-3]:[5]

Jerome Smith (African American male) aborted a takeoff in LaGuardia after he attempted take off with only one engine operating and never filled out a mandatory Irregularity Report, but Smith was not terminated.

Erin Lloyd (Caucasian female) declared an emergency due to a pitch trim runaway (a pilot error) and despite an investigation by the Federal Aviation Administration, Felice did not believe she was disciplined.

---

[4]The word "termination" is used throughout this Order for purposes of clarity.

[5]Felice also named Eric Sederman (Caucasian male), Joseph Romano (Caucasian male), and Timothy Lane (while male) as comparators, but Felice indicated they were treated more favorably because of their age; yet, Felice has not brought an age discrimination claim.

Keri Weber (Caucasian female) declared an emergency in Orlando due to a flap malfunction but did not file a mandatory Irregularity Report and was not terminated.

Heather Happy (Caucasian female) had some "incident," but Felice could not remember what happened, he could only remember that she was not disciplined.

Mike Paul (male of an unknown race) was the dispatcher for Flight 3421 and despite his errors (as alleged by Felice), Paul was not disciplined.

Felice did not know of other pilots who found themselves in a similar fuel shortage situation, but he believed it has happened in the past [DE 58-4 at 27-28]. Republic also identified 6 Caucasian males and 1 Hispanic male, who worked for Chautauqua Airlines or Shuttle America, Inc., and were terminated (or forced to resign) for cause after indicating an inability to perform their job duties safely [DE 58-2].

***Plaintiff's Request to Strike***

The facts recited above take into account the following ruling on the admissibility of certain evidence:

Embedded within Felice's brief in opposition is the request to strike certain evidence and factual statements submitted in support of Republic's summary judgment motion [DE 61 at 4-8]. The Court could reject Felice's request for failure to file a separate motion, *see* N.D. Ind. L.R. 56-1(e) (citing Local Rule 7-1), but declines to do so. *See Modrowski v. Pigatto*, 712 F.3d 1166 (7th Cir. 2013) ("we have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment. It does not follow, however, that district courts cannot exercise their discretion in a more lenient direction: litigants have no right to demand strict enforcement of local rules by district judges" so long as the

district court does not enforce or relax the rules unequally as between the parties) (internal quotation marks and citations omitted).

Despite Felice's failure to file a separate motion to strike, Republic has been afforded sufficient opportunity to review and respond to the contested materials. In fact, Republic did provide a response [DE 62]. Moreover, as further detailed below, most of the evidence and factual statements sought to be struck by Felice as a mischaracterization of the evidence are mooted by the simple fact the Court must construe the contested facts in Felice's favor on summary judgment.

<u>DE 61 and DE 62 at ¶¶ 9, 10, 12</u>: Felice argues Republic mischaracterizes Felice's affidavit and deposition testimony. Felice's argument is based on Republic's contention that Jeffrey Davis' deposition and affidavits provide "uncontroverted evidence" (or "make clear") that Felice "failed to consider" the effect on fuel by flying at a lower altitude than planned; Felice "incorrectly assumed that since AUS was his original alternate, he would have enough fuel to make it there safely, regardless of flight plan deviations by him, *e.g.*, an altitude change"; and Felice was "unaware of the fuel state" and the fact that he was low on fuel until nearing arrival in AUS. While the Court understands that these statements are based on Davis' personal investigation into the incident, it does not logically follow that Davis' contentions must then be deemed "uncontroverted," as argued by Republic.

Felice's assertions in his deposition and affidavit actually conflict with Davis' assertions because Felice testified that in passing over DFW he communicated to dispatch that he was headed to AUS with 5,700 pounds of fuel on board [DE 58-4 at 8-11; DE 61-36 at 2]. And as the non-moving party, it is well understood Felice is entitled to have the facts and reasonable inferences construed in his favor. Therefore, the only reasonable inference that can be drawn

from Felice's statements is that he had in fact considered, and was aware of, the amount of fuel remaining when passing over DFW, after having flown at a lower altitude.

Moreover, Republic incorrectly believes the Court should accept Davis' version of events simply because Davis' affidavit and deposition provide alleged statements by Felice thereby rendering them non-hearsay, under Fed. R. Evid. 801(d)(2), as statements of a party opponent. Yet the issue is not whether Davis' statements are admissible as non-hearsay; instead, the argument posed by Felice concerns the proper construction of the facts. And as indicated, when construing the facts in Felice's favor, it is clear that upon passing over DFW Felice considered the amount of fuel that remained and reported this amount to dispatch. He also considered the amount of fuel he thought would remain in the aircraft upon landing in AUS [DE 61-22]. Any contention to the contrary is rejected at the summary judgment stage.

DE 61 and DE 62 at ¶ 13: Felice argues Republic similarly misconstrues the facts in ¶ 13. Felice testified during his deposition that when he sent dispatch a text to "Coordinate fuel *in* Austin" he meant to tell dispatch to coordinate "fuel *to* Austin." [DE 58-4 at 17-20]. Republic argues that on account of Felice's uncorrected typographical error, dispatch "never received a communication from Felice regarding Flight 3421's fuel consumption" and from Republic's perspective "Felice neglected to confer with dispatch and verify his assumptions about Flight 3421's fuel levels."

Again, Felice's deposition and affidavit directly conflict with the inferences Republic wants drawn because Felice *did* communicate with dispatch that he believed the aircraft had 5,700 pounds of fuel when passing over DFW [DE 58-4 at 8-11; DE 61-36 at 2]. Regardless of the message directing dispatch to coordinate fuel "in Austin" (which may or may not have led dispatch to believe fuel calculations were only necessary for the next flight), this confusing

message came only minutes after Felice had already clearly confirmed the estimated amount of fuel on board [DE 58-4 at 6, 17; DE 58-5 at 2]. So the only permissible inference that can be drawn from these facts is Felice *did* confer with dispatch and verify his belief about Flight 3421's fuel levels. It was dispatch who never confirmed Felice's actual fuel burn levels. Nor was Felice ever told that he had inadequate fuel to make it to AUS, his original "filed alternate."

DE 61 and DE 62 at ¶ 18: Republic argues Felice has "no evidence to support a claim that other similarly-situated Republic employees committed similar violations of Republic's policies, but received more favorable treatment than he did because of their sex or race." [DE 57 at 10]. Republic contends any comparators identified by Felice in his *deposition* were not based on his personal knowledge.

In response, Felice asserts he was never asked during his *deposition* whether the information he provided concerning comparators was based on "personal" or "firsthand" knowledge [DE 61 at 8-9].

In reply, Republic focuses on Felice's *affidavit* (rather than his deposition) and argues that the affidavit suffers from hearsay problems as well,[6] because Felice's comparator evidence is based on Felice's review of reports which constitutes hearsay under Rule 56(c)(4) and Rules 602, 801(a) and 802 [DE 62 at 7].

Relative to Felice's deposition, Republic does not identify any testimony provided by Felice wherein Felice acknowledges a lack of personal or firsthand knowledge of the comparators. In fact, the deposition testimony relied on by Republic [DE 57 at 9-10 (citing DE 58-4 at 47-53)], shows Felice was never asked about the basis of his comparator information.

---

[6]Felice did not respond to the later argument made by Republic in its reply brief, since the motion to strike was not separately filed and briefed.

Thus, one cannot draw the impermissible negative inference that Felice lacks the requisite personal knowledge.

Relative to Felice's affidavit, it is true that any affidavit submitted for the court's consideration in ruling on a motion for summary judgment must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "[A]lthough personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.'" *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (quoting *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc)).

Felice affirmed that while serving as the Chairman of the union's executive committee for 3 years, ending shortly before his termination in March 2008, he regularly participated in and/or reviewed "official reports of grievances and other disciplinary and/or performance matters" involving Republic pilots [DE 61-35, ¶ 5]. These reports "routinely" identified the pilot involved, described the incident, and discussed the way the company addressed or intended to address those issues." *Id*. Felice affirmed his involvement and/or review in the reports involving pilots Jerome Smith, Erin Lloyd, Keri Weber, Eric Sederman, and Joseph Romano. *Id*. at ¶¶ 6-10.

Based on these statements, the Court concludes there is no merit in the argument that Felice lacks personal knowledge of the assertions contained in his affidavit. Felice was clearly in a position with the union requiring his personal participation in or review of pilot conduct reports and the resolution thereof. This is sufficient to establish he has particularized knowledge of

these facts given his personal involvement in the process concerning disciplinary or performance issues of Republic pilots, including the incidences involving the relevant comparators discussed herein, Jerome Smith and Keri Weber.

With respect to Republic's hearsay argument, it is true that out of court statements made for the truth of the matter asserted are hearsay, Fed. R. Evid. 801(c), and are generally inadmissible unless another rule applies providing for its admission, Fed. R. Evid. 802.  Here, Felice notes that the reports he reviewed were "official reports" of Republic which are routine in nature and were created while he was serving as the Chairman of the union's executive committee [DE 61-35 at 2-3].  This establishes a sufficient foundation at this time for the admission of their contents through Felice as business records under Fed. R. Evid. 803(6). *See United States v. Reese,* 666 F.3d 1007, 1017 (7th Cir. 2012) (necessary for the admission of business records is the testimony of a qualified witness that the records were kept in the course of a regularly conducted business activity, and that it was the regular practice of that business to make such records) (citation omitted).  Nothing contradicts this conclusion.  Felice need not be the author of the reports but must have personal knowledge of the procedure used to create and maintain them, which he does. *See id.*

On the other hand, the Court excludes Felice's statement relative to an unidentified pilot [DE 61-35, ¶ 11].  Felice admits that the only knowledge he has concerning this unidentified comparator came from some report received from a third party, the National Transportation Safety Board.  There is insufficient information concerning the origin of this report or Felice's knowledge concerning its creation, and therefore the Court agrees with Republic that the evidence is inadmissible.

To be clear, the Court's determination on any request to strike factual averments or evidence has been incorporated in the facts previously recited.

## II. Standard of Review

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Kerri v. Bd. Of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any such material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* On the other hand, where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences in her favor. *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

## III. Discussion

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment" because of the employee's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Felice accuses Republic of running afoul of Title VII's prohibitions by discriminating against him because of his sex (male) and race (Caucasian) [DE 1 ¶¶ 30-33]. The legal standard for both claims is the same, thus, there is significant overlap in the analysis of the two claims.

To prove that discrimination occurred, a plaintiff may proceed under either the direct method or the indirect method of proof. *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012) (citing *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004). Under the direct method, the plaintiff must produce either direct or circumstantial evidence of discriminatory intent. *Id.* And under the indirect method, the plaintiff must satisfy the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See id.* (citing *Dandy*, 388 F.3d at 273).

Felice proceeds under both methods here; however, because Felice prevails under the indirect method there is no need to analyze the facts under the direct method.

### *Indirect method*

The analysis of Title VII claims brought under *McDonnell Douglas* proceeds in three stages. First, the plaintiff must establish a prima facie case. Ordinarily, the four elements of the prima facie case in a termination context are that the plaintiff was a member of a protected class, the plaintiff suffered an adverse employment action, the plaintiff was performing his job satisfactorily, and that a similarly-situated individual outside of the plaintiff's protected class was

treated more favorably. *Everett v. Cook County*, 655 F.3d 723, 730 (7th Cir. 2011) (citation omitted).  But because this is a reverse-discrimination case, the Seventh Circuit has replaced the first element with a requirement that the plaintiff show "background circumstances" that demonstrate a particular employer has "reason or inclination to discriminate invidiously against [the majority]" or evidence that there is something "fishy" about the termination. *Good v. Univ. of Chi. Med. Ctr.,* 673 F.3d 670, 679 (7th Cir. 2012) (citing *Phelan v. City of Chi.*, 347 F.3d 679, 684–85 (7th Cir. 2003) (altering first prong of the indirect case to account for reverse nature of race discrimination claim)).

After the plaintiff has made a prima facie case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the employment action. *Stockwell v. City of Harvey*, 597 F.3d 895 (7th Cir. 2010) (citation omitted).  Once the employer has articulated a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination falls away and the plaintiff then has the burden of producing sufficient evidence to show that reason to be pretextual. *Id.* (other citations omitted).

### Something "fishy" about Felice's termination

To establish the first element of the prima facie case, Felice must show "background circumstances" that demonstrate that a particular employer has "reason or inclination to discriminate invidiously against [the majority]" or evidence that there is something "fishy" about the termination. *Good,* 673 F.3d at 679 (citing *Phelan*, 347 F.3d at 684–85). In *Phelan*, the plaintiff was a Caucasian man who argued that he had been unfairly treated because of his race. His reverse discrimination case failed because he was unable to present any facts from which a jury could infer that his Caucasian superiors were inclined to discriminate against their fellow

Caucasians; indeed, the plaintiff had been replaced by a Caucasian person. *Phelan,* 347 F.3d at 684–85.

Felice, too, is a Caucasian male. And although the Court has no evidence indicating who Felice was replaced by, unlike the plaintiff in *Phelan*, Felice has offered facts that could suggest to a reasonable jury that Republic had a reason or inclination to discriminate against Caucasian or male persons. As detailed below, when viewing the facts in Felice's favor, it appears that Republic did not follow its own disciplinary policies in terminating Felice; the company policies reportedly violated by Felice were not necessarily violated; the only other pilots terminated for an inability to perform their job duties safely were Caucasian males (except one who was Hispanic); and Republic did not engage in progressive discipline with respect to Felice but did not terminate other non-Caucasian or female pilots for seemingly more serious conduct.

Here, the forced resignation of Felice is somewhat suspect. First, prior to his termination Felice never received a written statement of his charges, even though his forced resignation could be considered a form of discipline, thereby requiring written charges per the collective bargaining agreement. And according to Felice's version of the facts, he also did not receive a hearing which Republic was required to provide. *See Everett*, 655 F.3d at 728 ("To be sure, an employer's failure to abide by its own internal procedures may, combined with other evidence, raise the specter of discriminatory animus. But for a jury to be able to infer any impropriety based on an employer's failure to abide by its own procedures, the employee must show that there was an actual procedure in place that served to bind the employer's discretion.") (internal citation and citation omitted).

Second, whether Felice violated company policies is a matter of dispute. Despite Republic's statements to the contrary, the facts viewed in Felice's favor show that he *did*

properly report to dispatch that he was diverting to AUS (once he was told he could expect to hold over DFW). Moreover, Felice *did* report his estimated fuel to dispatch when diverting to AUS. It was dispatch who failed to confirm the actual fuel consumed, and who failed to provide sufficient information and time for Felice to consider alternative landing locations. And while Republic also accuses Felice of failing to file a timely Irregularity Report and failing to contact dispatch regarding the "emergency" he declared on Flight 3421, Republic conflates the term "emergency." Republic's own FOM explicitly denotes what is required for declaring "emergency fuel". *See* Part 20.13.3 (requiring notification to ATC and dispatch). In subsequent parts of the FOM, Republic provides that a written "Irregularity Report" must be filed when a pilot has declared an "emergency" or "exercise[ed] . . . emergency authority." *See* Parts 20.7.2, 20.7.5, 21.1.4. Yet Republic does not identify any policy requiring a written Irregularity Report[7] after "emergency fuel" has been declared. In other words, given that the FOM once set forth requirements concerning "emergency fuel" reporting, it logically follows that if a fuel emergency required an Irregularity Report, then the FOM would have explicitly stated the same.

Third, even assuming Felice filed an Irregularity Report a mere one day late and/or did not timely report his diversion or fuel emergency to dispatch, these constitute mere reporting violations. While Republic was not required to engage in progressive discipline, because its disciplinary actions are usually "progressive in nature" the failure to employ the policy here without sufficient explanation as to how Felice's conduct amounts to serious misconduct, that avoids the customary progressive discipline, makes suspicious Republic's decision to terminate Felice.

---

[7]Republic did not identify the failure to file an Irregularity Report based on the diversion to AUS as a basis for Felice's termination.

In other words, although the Court does not second-guess facially legitimate business decisions, the decision here appears not so legitimate where Felice has pointed to specific facts placing Republic's explanation in doubt. *See Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005). Simply put, the record does not support Republic's contention that Felice's behavior indicated his inability to perform his job safely. Instead, Felice had considered his fuel levels before diverting to AUS and complied with Republic's policy in calling a "fuel emergency" as soon as he believed a delayed landing in AUS would cause the aircraft to land with less than 2,000 pounds of fuel. Given the precaution taken by Felice, Flight 3421 was given priority landing and safely landed, without the need for standby emergency personnel and with 25% more fuel than would constitute a fuel emergency. Despite this, Republic equates Felice's behavior to the conduct of 7 male pilots (6 Caucasian and 1 Hispanic) who were terminated (or forced to resign) from 2001 to 2009 for incidents indicating "a potential inability to perform their job duties safely." [DE 58-2]. In particular, these pilots left the cockpit unattended, took an aircraft off the runway, failed to give notice of takeoff, landed at an incorrect airport, and hit the wing of an aircraft on a concrete barrier [DE 58-2]. Republic's attempt to equate Felice's alleged reporting violations to these other piloting errors, without further explanation, falls short.[8]

Finally, even assuming Felice's conduct evinced his inability to perform his job duties safely (as Republic contends), it is significant that all 8 of the pilots terminated (including Felice) were male, with 7 of them being Caucasian. (Although admittedly Republic has not indicated how many non-Caucasian and/or female pilots it employs). Moreover, Felice has identified at

---

[8]Again, the Court has already rejected any contention that when passing over DFW Felice failed to consider the amount of fuel that remained, failed to report this amount to dispatch, or failed to consider the amount of fuel that would remain upon landing in AUS.

least one African American pilot, Jerome Smith, who (after aborting a takeoff) never filed a mandatory Irregularity Report, and one female pilot, Keri Weber, who (after declaring an emergency due to a flap malfunction) never filed a mandatory Irregularity Report, without being terminated by Republic. While evidence of these employees alone may not have created a genuine issue of material fact, *see, e.g., Hague v. Thompson Distribution Co*., 436 F.3d 816, 822–23 (7th Cir. 2006) (five Caucasian plaintiffs satisfied the "background circumstances" prong by presenting evidence that after their African American boss fired them, they were replaced by three African American employees, an African American employee was assigned duties of the fourth, and the fifth was not replaced), when combined with the other evidence of record, it appears that something "fishy" is going on and the Court is unable to conclude that Republic is entitled to judgment as a matter of law on this element of the prima facie case. *See Farr v. St. Francis Hosp. and Health Ctrs*., 570 F.3d 829, 833 (7th Cir. 2009) (the plaintiff must set out "background circumstances" that show . . . there is something "fishy" going on).

### *Adverse employment action, satisfactory performance & pretext*

No one contests the fact that Felice suffered an adverse employment action by being forced to resign in lieu of termination [DE 57 at 16; DE 61 at 12, n. 11]. *See Leitgen v. Franciscan Skemp Healthcare, Inc*., 630 F.3d 668, 673-674 (7th Cir. 2011) ("[t]here is no dispute that [plaintiff's] forced resignation constitutes an adverse employment action").

So the Court considers whether disputed material facts exist relative to Felice's job performance. However, in a case like this one, the issue of satisfactory performance and the question of pretext overlap because Republic asserts as its nondiscriminatory reason for termination that Felice was not meeting legitimate job expectations, and therefore the credibility of Republic's assertion is at issue for both the second element of Felice's prima facie case and

the pretext analysis. *See Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 478-79 (7th Cir. 2010) (citations omitted).

Generally, the proper inquiry with respect to satisfactory performance requires consideration of job performance through the eyes of Felice's supervisors at the time of the termination. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008) (citation omitted). And in order to show pretext, a plaintiff must show that the employer's non-discriminatory reason was dishonest and the employer's true reason was based on a discriminatory intent. *Stockwell*, 597 F.3d at 901 (citations omitted). If the plaintiff uses indirect evidence to meet his burden, he must show that the employer's reason is not credible or factually baseless and provide evidence supporting the inference that the real reason was discriminatory. *Id* (other citations omitted).

Republic asserts Felice was not meeting its legitimate performance expectations by: failing to remain vigilant as to the fuel levels on Flight 3421; disregarding the directive to remain aware of fuel consumption; proceeding to AUS without considering the amount of fuel burned; disregarding closer alternative airports for landing; and failing to contact dispatch and file an Irregularity Report within 48 hours regarding his declaration of a fuel emergency [DE 57 at 17-18]. But the Court has already identified the disputed issues of material fact which exist concerning whether Felice actually violated any of these policies as identified by Republic. To repeat, at the summary judgment stage, the only permissible inference that can be drawn from the facts is that in passing over DFW, Felice did confer with dispatch and verify his belief about Flight 3421's fuel levels and the decision to divert to AUS. It was dispatch who never confirmed Felice's actual fuel burn levels despite its responsibility to do so. Moreover, Felice did consider the option of landing in SPS or OKC, but his consideration was based on the limited information and insufficient amount of time provided by dispatch. In any event, Felice declined to change

direction, which was a decision within his authority to make. And as previously discussed, Republic's FOM did not specify that an Irregularity Report was required after declaring a "fuel emergency" rather than an actual emergency. To the extent Felice should have notified dispatch "as soon as possible" of his declaring a fuel emergency, Republic fails to establish that such a violation is so "flagrant, serious or continuous" under its progressive discipline policy to result in outright termination.

Felice has sufficiently established a triable issue concerning whether he was performing his job satisfactorily. And similarly, there is sufficient debate over whether Republic's stated reason for termination was dishonest and factually baseless. *See Coleman v. Donahoe*, 667 F.3d 835, 855 (7th Cir. 2012) ("there is inherent 'fishiness' in an employer's proffered reason when it rests on a policy that does not legitimately apply to the employee who was terminated."). Felice has also provided evidence supporting the inference that the real reason was discriminatory given the non-termination of similarly situated non-Caucasian or female pilots for more egregious or similar offenses, and given Republic's admitted track record for terminating Caucasian males. At the summary judgment stage, the Court cannot conclude that Felice was failing to adequately perform his job or that Republic honestly believed its asserted nondiscriminatory reason. *See Ptasznik v. St. Joseph Hosp*., 464 F.3d 691, 696 (7th Cir. 2006) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.") (citation omitted).

***Similarly-situated comparators***

Lastly, as previously mentioned, Felice has offered evidence sufficient to establish that a similarly-situated individual outside of his class was treated more favorably. To elaborate, the comparators identified by Felice and based on his first hand knowledge were all Republic pilots,

were all held to the same standards and subject to the same policies, and were all supervised by Jeffrey Davis. *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) ("The similarly-situated analysis calls for a 'flexible, common-sense' examination of all relevant factors . . . [with] [a]ll things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination.") (citation omitted). Two individuals identified by Felice, Jerome Smith (African American) and Keri Weber (female), failed to file mandatory Irregularity Reports after committing serious safety infractions and were not terminated. While it is true that these pilots did not declare a "fuel emergency," Keri Weber did declare an "emergency" which the record suggests represents a more serious situation, thereby further supporting Felice's claim of discrimination. In any event, any distinctions between Felice and the comparators are not so significant that they render the comparison effectively useless (by not allowing for a meaningful comparison). *Good*, 673 F.3d at 675 (citation omitted).

Ultimately, the Seventh Circuit has recognized that the methods for proving and analyzing employment discrimination cases have become too complex, too rigid, and too far removed from the statutory question of discriminatory causation. *Good*, 673 F.3d at 680 (citation omitted). And while maybe not a strong case, focusing on the summary judgment evidence in the light most favorable to the opponent, the Court sees evidence that would allow a reasonable jury to make a finding of reverse race and/or sex discrimination in favor of Felice.

### IV. Conclusion

For the aforementioned reasons, the Court DENIES Republic Airlines' motion for summary judgment [DE 56] in relation to Felice's sex and race discrimination claims brought

under Title VII of the Civil Rights Act of 1964.  With the lapse of the discovery and dispositive

motion deadlines, the case will be SET for a telephonic scheduling conference.

SO ORDERED.

ENTERED: June 17, 2013

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court